

# Missouri Court of Appeals
## Western District

| | |
|---|---|
| STATE OF MISSOURI, EX REL., ) | |
| JEFF PETERS & JOHN NEWMAN, ) | WD85719 consolidated with |
| ) | WD85777 |
| Appellant-Respondents, ) | |
| v. ) | OPINION FILED: |
| ) | |
| SCOTT FITZPATRICK, ) | August 29, 2023 |
| TREASURER, STATE OF ) | |
| MISSOURI AND COLLEEN JOERN ) | |
| VETTER, DIRECTOR OF THE ) | |
| MISSOURI DIVISION OF ) | |
| WORKERS' COMPENSATION, ) | |
| ) | |
| Respondent-Appellants. ) | |

**Appeal from the Circuit Court of Cole County, Missouri**
**The Honorable Daniel Green, Judge**

**Before Division Two: W. Douglas Thomson, Presiding Judge,**
**Thomas N. Chapman, Judge, and Janet Sutton, Judge**

Relator Jeff Peters appeals the judgment of the Cole County Circuit Court

denying his petition for writ of mandamus against Respondents Scott Fitzpatrick,

Treasurer of the State of Missouri, and Colleen Joern Vetter, Director of the

Missouri Division of Workers' Compensation, seeking to compel payment of

$1,142,169.57 from the Second Injury Fund ("Fund").[1] Respondents cross-appeal

from the judgment in favor of Relator John Newman, Peters's attorney, issuing a

writ of mandamus ordering Respondents to pay Newman $230,332.50 for attorney

fees from the Fund. The judgment is affirmed in part and reversed in part, and the

writ of mandamus is quashed.

## Factual and Procedural Background

On November 14, 2006, Peters suffered severe injuries in a motor vehicle

accident in the course of his employment. Peters filed a workers' compensation

claim against both his employer and the Fund. His claim against the Fund was

based on allegations that his employer was uninsured and that the Fund was

responsible for his medical expenses under section 287.220.5.[2]

An administrative law judge ("ALJ") heard Peters's claim on August 30,

2011.[3] Two of the issues to be determined at the hearing were whether the Fund

---

[1] As stipulated to by the parties, Respondent Director of the Missouri Division of Workers' Compensation is charged with the statutory obligation to requisition warrants on Respondent Treasurer of the State of Missouri for the payment of all amounts payable for compensation and benefits out of the Fund. Such payments are issued by Respondent Treasurer of the State of Missouri. The Office of the Missouri Attorney General is the attorney and agent for Respondents, including regarding negotiations regarding payment or refusals to pay the requested payments.

[2] All statutory references are to RSMo 2000 as supplemented through November 14, 2006, the date giving rise to Peters's workers' compensation claim, unless otherwise indicated.

[3] The healthcare providers who provided care to Jeff Peters for the injuries sustained were not parties to the claim and were not present or represented at the hearing. They did not file

was liable for unpaid medical expenses due from an uninsured employer and what were the reasonable charges for the unpaid medical bills. At the hearing, Peters presented evidence of medical bills totaling $1,142,169.57. The Fund presented evidence that Loma Linda University Medical Center had agreed to accept $424,773.00 as payment in full for the outstanding amount due of $1,023,699.93.

On December 2, 2011, the ALJ issued her award ("Award") finding Peters's injury compensable, that his employer was uninsured, and that his employer had paid none of the medical bills at issue. The Award found that Peters incurred the following medical bills as a result of the work injury:

| | | |
|---|---|---:|
| Loma Linda Pathology | $ | 339.00 |
| Mercy Air Services | | 13,661.07 |
| California Department of Transportation | | 2,321.27 |
| Loma Linda Group | | 948.00 |
| Loma Linda Surgical Group | | 39,902.25 |
| Loma Linda Orthopedic Group | | 39,396.00 |
| Loma Linda Neurology Group | | 334.00 |
| Loma Linda Physicians Group | | 737.05 |
| Loma Linda Medical Center | | 1,023,699.93 |
| Loma Linda Anesthesiology | | <u>20,735.00</u> |
| Total | | $ 1,142,169.57 |

The Award found that the fair, reasonable, and necessary charges resulting from his medical treatment was $1,142,169.57, which included the full amount originally

applications for direct payment to them for their treatment of Peters pursuant to 8 CSR 50-2.030(2).

billed by Loma Linda University Medical Center of $1,023,699.93. The ALJ explained that settlement negotiations between the parties for resolution of outstanding medical bills were not evidence of fair, reasonable, and necessary charges and that no evidence was presented that Peters did not remain responsible for the full amount of his medical bills, which totaled $1,142,169.57, including $1,023,699.93 billed by Loma Linda University Medical Center. The Award further found:

> Because the employer was uninsured, I find that the Second Injury Fund is liable for unpaid medical expenses incurred due to the injuries [Peters] sustained in his work-related accident of November 14, 2006. These medical bills total $1,142,169.57, as set forth above. I order the Second Injury Fund to pay these medical bills.

The Award allowed Newton's attorney fees "in the amount of 25% of all payments hereunder" and imposed "a lien on the proceeds until paid." Finally, the Award ordered that interest shall be paid as provided by law. No application for review or appeal was filed, and the Award became final.

After the Award became final, the Attorney General's Office, on behalf of the Fund, advised that the Fund would not be able to pay the Award immediately due to fund constraints. At the suggestion of the Attorney General's Office, Peters filed an application for judgment on the award in the Circuit Court of Greene County under section 287.500. On July 31, 2012, the Greene County Circuit Court

entered judgment against the Treasurer of the State of Missouri (custodian of the Fund) in the amount of $1,142,169.57, with interest of 10% per annum from January 12, 2012 ("Greene County Judgment"). The Greene County Judgment was not appealed and became final.

Thereafter, Peters and Newman sought payment of the Greene County Judgment, specifically $1,142,169.57 in past medical expenses, interest of 10%, and the 25% attorney fee lien on the total Award. Respondents did not pay Peters any amount. In September and November 2013, Respondents paid from the Fund nine of his ten medical providers the total of their billed amount less application of Newman's 25% attorney fee. Specifically, they paid $88,852.25 to the medical providers and $29,617.39 directly to Newman. They also paid Loma Linda University Medical Center $102,369.99 and in exchange, the Medical Center executed a Release providing that the amount paid "satisf[ied] all liability of Jeff Peters and the Fund to Loma Linda for medical bills and expenses relating to the award dated December 2, 2011, from the Missouri Division of Workers' Compensation and the work-related injury Jeff Peters sustained on November 14, 2006, in the State of California." Respondents also paid Newman directly 25% of the amount paid to Loma Linda University Medical Center ($25,592.50). In total, Respondents paid $191,222.24 to Peters's medical providers and $55,209.89 to

5

Newman. The payments made by Respondents did not include any amount for interest. Peters and Newman did not consent to the payments to the medical providers, to lower payments than set forth in the Greene County Judgment, or to any alteration of the Award's or Greene County Judgment's award, fees, or liens.

On October 9, 2019, Relators filed the instant action requesting a writ of mandamus ordering Respondents to pay the outstanding judgment entered in their favor against the Fund in the amount of $1,142,169.57 plus interest as required by section 287.220.[4] They alleged that such amount was the due and owing obligation set forth in the Award and Greene County Judgment in favor of Peters, and in favor of Newman for his statutory attorney lien, against the Fund.

---

[4] The parties stipulated that Relators could not bring the claim until this time "given the statutory priority payment schedule set forth by the legislature [in section 287.220.15, Cum. Supp. 2014] and the progress of payments of those claims higher in the statutory hierarchy." Section 287.220.15 provides:

> The division shall pay any liabilities of the fund in the following priority:
> (1) Expenses related to the legal defense of the fund under subsection 4 of this section;
> (2) Permanent total disability awards in the order in which claims are settled or finally adjudicated;
> (3) Permanent partial disability awards in the order in which such claims are settled or finally adjudicated;
> (4) Medical expenses incurred prior to July 1, 2012, under subsection 7 of this section; and
> (5) Interest on unpaid awards.

The parties submitted a joint stipulation of undisputed facts to the trial court. They filed competing motions for summary judgment and statements of uncontroverted material facts, which incorporated the joint stipulation.

On September 20, 2022, the trial court entered summary judgment in favor of Respondents on Peters's claim that a writ of mandamus should issue ordering them to pay him $1,142,169.57. It also entered summary judgment in favor of Newman on his claim for attorney fees of 25% of $1,142,169.57. It ordered by Writ of Mandamus that Respondents pay Newman $230,332.50 for attorney fees from the Fund ($285,542.39 (25% of $1,142,169.57) minus $55,209.89 previously paid to Newman).

This appeal by Peters and cross-appeal by Respondents followed.

**Standard of Review**

Appellate review of the trial court's grant or refusal of a writ of mandamus is for an abuse of discretion. *State ex rel. Deckard v. Schmitt*, 532 S.W.3d 170, 174 (Mo. App. W.D. 2017). "The trial court necessarily abuses its discretion where its ruling is based on an erroneous interpretation of the law." *Id.* (internal quotes and citation omitted). The trial court's conclusions of law are reviewed *de novo*. *Id.*

Appellate review of the trial court's grant of summary judgment is *de novo*. *Green v. Fotoohighiam*, 606 S.W.3d 113, 115 (Mo. banc 2020). The appellate

court applies the same criteria as the trial court in determining whether summary judgment was proper. *Id.* Summary judgment is proper if the moving party is entitled to judgment as a matter of law and no genuine issues of material fact exist. *Id.* Facts contained in affidavits or otherwise in support a party's summary judgment motion are accepted as true unless contradicted by the non-moving party's response to the motion. *Id.* "[T]he non-movant must support denials with specific references to discovery, exhibits, or affidavits demonstrating a genuine factual issue for trial." *Id.* at 116 (internal quotes and citation omitted). The record is reviewed in the light most favorable to the party against whom judgment was entered, and that party is entitled to the benefit of all reasonable inferences that may be drawn from the evidence. *Id.*

**Relator Peters's Appeal**

In his sole point on appeal, Peters challenges the trial court's denial of his petition for writ of mandamus. He argues that the trial court's ruling impermissibly allowed Respondents to collaterally attack the Green County Judgment and improperly allowed Respondents to pay third-party strangers to the judgment (the medical providers) rather than paying to him the judgment and interest ordered.

Mandamus is an equitable remedy. *State ex rel. Vescovo v. Clay Co.*, 589 S.W.3d 575, 589 n.14 (Mo. App. W.D. 2019). Its purpose is to compel the performance of a ministerial duty that one charged with the duty has refused to perform. *BG Olive & Graeser, LLC v. City of Creve Coeur*, 658 S.W.3d 44, 47 (Mo. banc 2022); *Deckard*, 532 S.W.3d at 174. "A ministerial duty is a duty of a clerical nature which a public officer is required to perform upon a given state of facts, or in a prescribed manner, in obedience to the mandate of legal authority, without regard to his own judgment or opinion concerning the propriety of the act to be performed." *Curtis v. Mo. Democratic Party*, 548 S.W.3d 909, 915 (Mo. banc 2018) (internal quotes, citation, and emphasis omitted). "Mandamus does not issue except in cases where the ministerial duty sought to be coerced is definite, arising under conditions admitted or proved and imposed by law." *Furlong Cos., Inc. v. City of Kansas City*, 189 S.W.3d 157, 166 (Mo. banc 2006). The purpose of mandamus is to enforce, not establish, a claim or right. *Vinson v. Mo. Comm'n on Human Rights*, 622 S.W.3d 218, 222 (Mo. App. E.D. 2021). "For a court to issue a writ of mandamus, there must be an existing, clear, unconditional, legal right in relator, and a corresponding present, imperative, unconditional duty upon the part of respondent, and a default by respondent therein." *BG Olive & Graeser*, 658 S.W.3d at 47. "A writ of mandamus is appropriate where it is necessary to prevent

great injury and injustice." *Deckard*, 532 S.W.3d at 174 (internal quotes and citation omitted).

Peters argues that because Respondents did not appeal the Greene County Judgment, which entered judgment in his favor and against the Fund in the amount of $1,142,169.57 with interest, it was final and binding on them. He asserts that Respondents' claim of satisfaction in the mandamus proceeding (by the Fund's direct payments to the medical providers) constituted an impermissible collateral attack on the Green County Judgment.

A collateral attack is "an attempt to impeach a judgment in a proceeding not instituted for the express purpose of annulling the judgment." *Mandacina v. Pompey*, 634 S.W.3d 631, 645 (Mo. App. W.D. 2021) (internal quotes and citation omitted). Generally, "a judgment rendered by a court having jurisdiction of the parties and the subject matter, unless reversed or annulled in some proper proceeding, is not open to contradiction or impeachment in respect to its validity or binding effect in any collateral proceeding." *Id.* (internal quotes and citation omitted). "Where a judgment is attacked in other ways than by proceedings in the original action to have it vacated or reversed or modified or *by a proceeding in equity to prevent its enforcement*, the attack is a collateral attack." *Id.*; *Barry, Inc.*

10

*v. Falk*, 217 S.W.3d 317, 320 (Mo. App. W.D. 2007) (internal quotes and citations omitted, emphasis added).

"Since an execution may not be run against the property of a…political subdivision of the State…the only other procedure available to a judgment creditor to enable him to collect his judgment is for a court of competent jurisdiction to issue its writ of mandamus…." *State ex rel. Hufft v. Knight*, 121 S.W.2d 762, 764 (Mo. App. 1938). Thus, "the preferred means to collect money clearly owed by the state is mandamus." *Otte v. Mo. State Treasurer*, 141 S.W.3d 74, 76 n.3 (Mo. App. E.D. 2004). A mandamus proceeding in such a case "is an ancillary proceeding to the main suit and when so employed is not a new suit, but simply process essential to jurisdiction." *Hufft*, 121 S.W.2d at 764. It is a means of enforcing the collection of a judgment against the State or political subdivision thereof and is the legal equivalent of an execution upon a judgment. *Id.*

In this way, mandamus is analogous to a special order to enforce a judgment in an appropriate manner authorized by law. "Such special orders encompass orders in special proceedings attacking or aiding the enforcement of the judgment after it has become final in the action in which it was rendered." *All Star Awards & AD Specialties, Inc. v. HALO Branded Sols.*, No. WD85491, 2023 WL 4566602, at *7 (Mo. App. W.D. July 18, 2023) (internal quotes and citations omitted).

11

"Missouri courts have treated a wide array of post-judgment rulings as 'special orders after final judgment' which are appealable under § 512.020(5)—without ever suggesting that such orders improperly amended the judgment." *Id.* "For example, a circuit court may enter a 'special order after judgment' to decide a motion under Rule 74.11(c) seeking a declaration that the judgment has been satisfied." *Id.* "Such rulings inevitably require the circuit court to resolve disputes…as to the extent of the judgment debtor's liability on the judgment." *Id.* The proceedings are not collateral attacks on the judgment. They do not attempt to impeach the judgment with respect to its validity or binding effect but to oppose or aid in enforcement of the judgment. *See, e.g., Id.* at *8 (trial court's judgment holding that plaintiff forfeited its right to recover post-judgment interest awarded to it in original judgment when it unsuccessfully appealed the adequacy of the punitive damages awarded in original judgment was not an improper, substantive modification of the original judgment but a special order after final judgment resolving the parties' dispute concerning enforcement of the original judgment in a manner authorized by law—specifically the amount of post-judgment interest owing on the original judgment).

In the case of a proceeding in mandamus to enforce a judgment against the State or political subdivision thereof, the court may look beyond the bare language

12

of the judgment, to the basis of the judgment, to determine how to enforce it. *See, e.g., State ex rel. Pullum v. Consol. Sch. Dist. No. 5 of Stoddard Co.*, 233 S.W.2d 702, 705-06 (Mo. 1950) (in enforcing judgment debt based on warrants issued by school district in payment of services of school teacher, court looked behind judgment, which provided no preference as to payment from the school district's fund, to warrants themselves, which were expressly payable out of the school district's funds). This is consistent with the procedure set out in the workers' compensation law to enforce awards. "The final award of the commission shall be conclusive and binding unless either party to the dispute shall, within thirty days from the date of the final award, appeal the award to the appellate court." § 287.495.1. "A Workers' Compensation award adjudicates the rights of the parties as effectively as a judgment of a court of law…." *Barry*, 217 S.W.3d at 320. While the final award in a workers' compensation case is an adjudication of the parties' rights, only a court can enforce an award. *Baxi v. United Techs. Auto. Corp.*, 122 S.W.3d 92, 96 (Mo. App. E.D. 2003). "Section 287.500 authorizes the trial court to enter a judgment on a final award as if it were an original judgment of the court." *Id.* It affords the means by which a final award becomes enforceable. *Id.* Section 287.500 provides, in pertinent part:

> Any party in interest may file in the circuit court of the county in
> which the accident occurred, a certified copy of a memorandum of

13

agreement approved by the division or by the commission or of an order or decision of the division or the commission, or of an award of the division or of the commission from which an application for review or from which an appeal has not been taken, whereupon said court shall render judgment in accordance therewith and notify the parties. Such judgment shall have the same effect and all proceedings in relation thereto shall thereafter be the same as though said judgment were a final judgment which has been rendered in a suit duly heard and determined by said court.

"Although section 287.500 authorizes a circuit court to enter a judgment on a final workers' compensation award as if it were an original judgment of the court, the statute affords no discretion to the court in entering a judgment." *State ex rel. ISP Minerals, Inc. v. Labor & Indus. Relations Comm'n*, 465 S.W.3d 471, 476-77 (Mo. banc 2015). *See also Carter v. Treasurer of the State of Mo. as Custodian of the Second Inj. Fund*, 506 S.W.3d 373, 376 (Mo. App. W.D. 2016). "A section 287.500 action is purely ministerial as it does not involve the merits of the award and the court does not determine any outstanding factual issues." *ISP Minerals,* 465 S.W.3d at 477. *See also Carter*, 506 S.W.3d at 376. A circuit court, therefore, may only enter a judgment that is in accordance with the final award. *Roller v. Steelman*, 297 S.W.3d 128, 134 (Mo. App. W.D. 2009). The obligations imposed in a workers' compensation case are established in the final award. *Johnston v. Saladino Mech. and Cincinnati Ins. Co.*, 504 S.W.3d 138, 140 (Mo. App. W.D. 2016).

14

The ALJ's Award in this case adjudicated the rights of the parties in this workers' compensation case. *Barry*, 217 S.W.3d at 320. When it was not appealed, the Award became conclusive and binding on them. § 287.495.1. Entry of the Greene County Judgment under section 287.500 provided the means by which the Award became enforceable. *Baxi*, 122 S.W.3d at 96. Entry of the judgment was purely ministerial and did not involve the merits of the Award. *ISP Minerals*, 465 S.W.3d at 477. The Greene County Judgment was entered in accordance with the Award as if the Award were an original judgment of the court. § 287.500; *ISP Minerals*, 465 S.W.3d at 476-77.

Peters sought the equitable remedy of mandamus to compel the performance of Respondents' ministerial duty to pay the Award. In response to his petition, Respondents did not deny the binding force of the Award or the Greene County Judgment or attack their validity. Rather, Respondents asserted that the Award and Greene County Judgment were satisfied by the Fund's payments to Peters's medical providers. Respondents' position in the mandamus proceeding to prevent the judgment's enforcement was not a collateral attack. *Mandacina*, 634 S.W.3d at 645; *Cf. Barry, Inc.*, 217 S.W.3d at 321 (where employer and insurer did not appeal workers' compensation award that awarded weekly death benefits to employee's wife and children without any cap or limitation and the award became final,

15

employer and insurer's declaratory judgment action alleging that a statutory cap on the death benefits should have been applied was an impermissible collateral attack on the final award, which adjudicated the rights of the parties as effectively as judgment of the court of law).

Furthermore, the trial court did not err in granting summary judgment in favor of Respondents because the Fund fully paid and satisfied the Award. Chapter 287 requires that all employers (as defined in the chapter) carry insurance under the Workers' Compensation Law. § 287.280; *Higgins v. Treasurer of State of Mo.*, 140 S.W.3d 94, 98 (Mo. App. W.D. 2004); *Mann v. Varney Constr.*, 23 S.W.3d 231, 233 (Mo. App. E.D. 2000). The Fund receives its funding from insurers and employers who comply with the law. *Higgins*, 140 S.W.3d at 98; *Mann*, 23 S.W.3d at 233. Under section 287.220.5, the Fund has limited liability to cover those employers who fail to provide workers' compensation insurance as required by law. *Higgins*, 140 S.W.3d at 98. It provides, in pertinent part:

> If an employer fails to insure or self-insure as required in section 287.280, funds from the second injury fund may be withdrawn to cover the fair, reasonable, and necessary expenses to cure and relieve the effects of the injury or disability of an injured employee in the employ of an uninsured employer….

§ 287.220.5. Section 287.220.5 does not direct the manner in which funds withdrawn from the Fund are to be paid. *Wilmeth v. TMI, Inc.*, 26 S.W.3d 476, 484

(Mo. App. S.D. 2000), *overruled on other grounds by Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 225 (Mo. banc 2003).

The Award, on its face, was conclusive of the obligations of the Fund. *Johnston*, 504 S.W.3d at 140. The Award found that Peters suffered a compensable work injury, that his employer was uninsured, and that his employer had paid none of his medical bills. It further found that Peters incurred $1,142,169.57 in medical bills (setting out the specific list of medical bills) as a result of the work injury and that that amount was the fair, reasonable, and necessary charges resulting from his medical treatment. Finally, the Award provided:

> Because the employer is uninsured, I find that the Second Injury Fund is liable for unpaid medical expenses incurred due to the injuries the claimant sustained in his work-related accident of November 14, 2006. These medical bills total $1,142,169.57, as set forth above. I order the Second Injury Fund to pay these medical bills.

The Fund paid the full billed amounts of nine of ten of Peters's providers—Loma Linda Pathology, Mercy Air Services, California Department of Transportation, Loma Linda Group, Loma Linda Surgical Group, Loma Linda Orthopedic Group, Loma Linda Neurology Group, Loma Linda Physicians Group, and Loma Linda Anesthesiology—less Newman's 25% attorney fees paid directly to him. The Fund also paid Loma Linda University Medical Center $102,369.99 for the medical bills incurred by Peters, rather than the full billed amount of

17

$1,023,699.93, in exchange for the provider fully releasing Peters and the Fund from "all liability…for medical bills and expenses relating to the award dated December 2, 2011." It directly paid Newman $25,592.50 (25% of the amount paid to the Medical Center).

Peters did not dispute that the Fund paid these medical bills. There was also no genuine dispute that Loma Linda University Medical Center released Peters from liability.[5] Pursuant to the Award, and consistent with section 287.220.5, the Fund paid Peters's fair, reasonable, and necessary medical expenses, and he was released from all liability for them. The Fund made the payments in compliance with, and in satisfaction of, the Award. The Award ordered the Fund "to pay these medical bills." The Award did not indicate that the Fund was not permitted to negotiate the existing

---

[5] In his response to Respondents' statement of uncontroverted facts, Peters denied Respondents' averment that in exchange for the reduced payment, the Medical Center released all liability of Peters and the Fund to it for medical bills and expenses relating to the December 2, 2011 award. He asserted that under the agreement, the Medical Center and the Fund released and forever discharged each other but not Peters himself. However, the agreement, which was attached to Respondents' statement of uncontroverted material facts, specifically provided,

> The Treasurer agrees to pay and Loma Linda [University Medical Center] agrees to accept $102,369.99 to satisfy all liability of Jeff Peters and the Fund to Loma Linda for medical bills and expenses relating to the award dated December 2, 2011, from the Missouri Division of Workers' Compensation and the work-related injury Jeff Peters sustained on November 14, 2006, in the State of California.

Peters did not otherwise support his denial with specific references to discovery, exhibits, or affidavits demonstrating a genuine issue for trial. *Green*, 606 S.W.3d at 116. There was no genuine issue of material fact regarding whether the Medical Center released Peters from liability for the medical bills related to his work-related injury.

unpaid medical bills. The Award did not order the Fund to pay any amount of medical bills directly to Peters.

Such was not the case in *Wilmeth v. TMI, Inc.*, 26 S.W.3d 476 (Mo. App. S.D. 2000), *overruled on other grounds by Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220 (Mo. banc 2003). In that case, the workers' compensation award provided, "Accordingly, the employer, [TMI,] and the Second Injury Fund are order to pay *to the claimant* the sum of $194,119.95, representing past medical care and expenses incurred." *Id.* at 483 (emphasis added). The *Wilmeth* court upheld the explicit instruction to pay the claimant directly, rather than the medical providers, because section 287.220.5 does not direct the manner in which funds withdrawn from the Fund are to be paid. *Id.* at 484. Absent express instructions in an award, section 287.220.5 allows the Fund to withdraw and pay funds in any manner. *Id.*

Unlike in *Wilmeth*, the Award in this case never explicitly ordered the Fund to pay Peters directly, rather it specifically instructed the Fund "to pay these medical bills." While the Award could have ordered the Fund to pay the full amount of the medical bills directly to Peters, it did not. By paying his medical providers directly, the Fund fully complied with and satisfied the Award's directive.

To allow Peters to recover the full cost of his medical bills from the Fund in this case would result in an impermissible windfall to him. Under the plain

19

language of section 287.220.5, the Fund is only liable to cover the fair, reasonable, and necessary expenses of an injured employee in the employ of an uninsured employer. "The clear language of [the statute] expresses the legislature's intent to limit the liability of the [Fund] for employees who are not covered by insurance as required by law." *Mann*, 23 S.W.3d at 233. The statute does not provide for any benefit payments to an employee of an uninsured employer. *Id.* It provides that only an employee's actual expenses be paid by the Fund. *Id.* It is against public policy to allow an employee to recover a windfall from the Fund when his employer had not carried insurance and made insurance contributions as required under the law. *Hood v. Menech*, 658 S.W.3d 178, 186 n.6 (Mo. App. E.D. 2022); *Mann*, 23 S.W.3d at 234. "[A]n employee should only be compensated for the employee's actual expenses as a result of the employee's injury when the employer is uninsured." *Mann*, 23 S.W.3d at 233.

Here, the Fund paid Peters's medical bills. Peters never claimed or presented evidence that he personally paid any medical bills or that any medical providers sought payment from him. Peters incurred no actual expenses. Any payment to him from the Fund would not go "to cure and relieve the effects of the injury." § 287.220.5. Peters was not entitled to compensation from the Fund for his medical bills. *See Phillips v. Par Elec. Contractors*, 92 S.W.3d 278, 286-89

20

(Mo. App. W.D. 2002), *overruled on other grounds by Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220 (Mo. banc 2003) (where the medical bills of an employee of a technically "uninsured" employer were already paid and discharged by employer's liability insurance carrier, employee was not entitled to monetary award from the Fund under section 287.220.5 because "any payment by [the Fund] to [employee] would be superfluous and unnecessary because it would not go to 'cure and relieve the effects of the injury or disability of an injured employee.'"); *Mann*, 23 S.W.3d at 233-34 (where employee of uninsured employer was only liable for $19,547.50 paid by Medicaid, payment from the Fund to employee of the full amount of his medical bills ($130,085.13) would constitute a windfall and be contrary to the language and intent of section 287.220.5).

Furthermore, Peters was also not entitled to any interest. As explained above, the Fund satisfied the Award and owed nothing more to Peters.

The trial court did not err in denying Peters's petition for writ of mandamus because the Fund fully paid and satisfied the Award.

The point is denied.

### Respondents' Cross-Appeal

In Respondents' cross-appeal, they contend that the trial court erred in granting Newman's writ of mandamus ordering them to pay him an additional

21

$230,332.50 for attorney fees from the Fund. Respondents contend that the Award only entitled Newman to attorney fees on the proceeds paid to satisfy the Award.

In granting the writ of mandamus ordering the Fund to pay Newman an additional $230,332.50, the trial court reasoned that Newman's attorney fees should be calculated as a percentage of the total amount billed by all of the medical providers ($1,142,169.57 x 25%) or $285,542.39. Because Newman had previously been paid $55,209.89 by the Fund, he was entitled to the additional amount. This was erroneous, however, under the plain language of the Award and section 287.220.5.

As discussed above in Peters's appeal, under the plain language of section 287.220.5, the Fund has limited liability to employees who are not covered by insurance as required by law. *Mann*, 23 S.W.3d at 233. The statute provides that only an employee's actual expenses be paid by the Fund. *Id.* It does not direct the manner in which funds withdrawn from the Fund are to be paid. *Wilmeth*, 26 S.W.3d at 484. Moreover "an employee of an uninsured employer should not receive a windfall from the Second Injury Fund on account of his employer's failure to carry insurance, as required under the law." *Hood*, 658 S.W.3d at 186 n.6 (citing *Mann*, 23 S.W.3d at 233-34).

22

The Award ordered the Fund to pay Peters's medical bills with no specific instruction to pay Peters directly. It further awarded Newton attorney fees "in the amount of 25% *of all payments hereunder*" and imposed "a lien *on the proceeds until paid*." (emphasis added). Under the plain language of the Award, Newman was entitled to attorney fees on the proceeds paid to satisfy the Award.

In compliance with the Award, the Fund paid Newman 25% of the full amount of the medical bills paid by the Fund to Loma Linda Pathology, Mercy Air Services, California Department of Transportation, Loma Linda Group, Loma Linda Surgical Group, Loma Linda Orthopedic Group, Loma Linda Neurology Group, Loma Linda Physicians Group, and Loma Linda Anesthesiology. The Fund also paid Newman 25%, or $25,592.50, of the proceeds paid to Loma Linda University Medical Center, which were accepted by the Medical Center as full payment. Accordingly, the Fund paid Newman everything he was due under the Award, i.e., 25% of all proceeds paid under the Award. Any additional payment to Newman would result in a windfall contrary to the language and intent of section 287.220.5. The trial court erred in granting Newman a writ of mandamus ordering Respondents to pay additional attorney fees.

The point is granted.

23

## Conclusion

The trial court's judgment denying Peters's petition for writ of mandamus is affirmed. The judgment granting Newman a writ of mandamus ordering Respondents to pay additional attorney fees is reversed, and the writ of mandamus is quashed.

_____
Thomas N. Chapman, Judge

All concur.